[No. B207183. Second Dist., Div. Eight. June 11, 2009.]

GEORGIA BODE, Plaintiff and Respondent, v.
LOS ANGELES METROPOLITAN MEDICAL CENTER, Defendant and
Appellant.

**COUNSEL**

Fisher, Sparks, Grayson & Wolfe, Jerry R. Sparks; Greines, Martin, Stein & Richland, Robert A. Olson and Marc J. Poster for Defendant and Appellant.

Fenton & Nelson, Henry R. Fenton, Dennis E. Lee and Benjamin J. Fenton for Plaintiff and Respondent.

**OPINION**

**RUBIN, Acting P. J.**—Los Angeles Metropolitan Medical Center appeals from the judgment entered after the trial court granted Dr. Georgia Bode's petition for administrative mandate to set aside the medical center's decision to first suspend, and then to not renew, her temporary privilege to practice there. We affirm.

### FACTS AND PROCEDURAL HISTORY

On January 2, 2003, Dr. Georgia Bode began work as an anesthesiologist at Los Angeles Metropolitan Medical Center (the hospital or L.A. Metro) with temporary, but renewable, 90-day practice privileges pending action on her application for membership on the hospital's medical staff. The hospital had recently replaced its entire anesthesiology staff after incidents involving the mishandling of controlled narcotic substances caused an accreditation agency to award the hospital only a conditional accreditation. Bode, who had

an unblemished record since she began practicing in 1987, gave up her staff membership at Centinela Hospital in order to go to L.A. Metro.

In response to the mishandled drug problem, the hospital instituted Sure-Med, a computer-operated drug dispensary system. In order to return unused drugs, a physician must enter information into the Sure-Med system specifying whether drugs were used, wasted (unreturned after disposal by an authorized method), or returned after not being used. Drug returns had to be witnessed and signed off by an authorized hospital staff member. The hospital's pharmacy staff would confirm the return, and would also review patient records to be sure physicians properly documented the use or wastage of unreturned drugs.

Within Bode's first three weeks at the hospital, she had problems properly documenting her use of various medications. Six incidents were reported between January 6 and January 18, 2003. Some were based on Bode's failure to sign her name to patient records; others involved the failure to document the dosage administered or the disposition of the drugs. On January 22, 2003, Dr. Dapo Popoola, the hospital's surgical chief, sent Bode a letter setting forth the six incidents. The letter ended by warning that any further occurrences "may result in disciplinary action including suspension of privileges." (Boldface omitted.) The hospital's records show that Bode received training and counseling about these issues and seemed to have resolved them satisfactorily.

On March 18, 2003, Bode withdrew several doses of medication to administer to a patient undergoing spinal surgery. The Sure-Med records showed that Bode obtained three ampules of fentanyl, two vials of Versed, and one ampule of Demerol. The patient's chart showed that all of the fentanyl and one of the Versed doses, but not the Demerol, were administered. The Sure-Med records also showed that Bode entered the return of the Demerol and the remaining Versed vial. This was witnessed by a nurse, Vargas, who entered her own user ID and password into the Sure-Med system to confirm Bode's actions. However, when pharmacy staff checked the machines the next day, they could not find the Demerol ampule. Vargas gave three versions of what she witnessed: (1) Vargas told her supervisor that she told Bode that Bode was returning fentanyl, not Demerol, and that the machine needed to be corrected; (2) Vargas told the pharmacy chief that she did not see or recall, or had been too busy to see or had no idea, what Bode had returned; and (3) Vargas told the head of the anesthesiology department that she told Bode that Bode was returning fentanyl, not Demerol.

On March 23, 2003, the hospital's surgery department held an emergency peer review meeting, where the hospital's chief of staff summarily suspended Bode's temporary privileges. On March 25, 2003, Bode appeared before a meeting of the surgery department to explain the missing Demerol ampule. Bode submitted a prepared statement. Distilled, Bode said Vargas, an experienced recovery room nurse, witnessed and signed for the return of the Demerol; the Sure-Med system is complicated; the recovery room nurses should be able to recognize Demerol when they see it; and she had never before had any problems with dispensing or returning controlled substances. The peer review committee was unable to "come to a concrete solution regarding the discrepancy." On March 26, 2003, the surgery department recommended that Bode's privileges remain suspended until their 90-day limit expired four days later. On March 31, 2003, L.A. Metro gave Bode official notice that her temporary privileges would not be renewed "because of issues surrounding the return of controlled substances."

Under state law and the hospital's bylaws, Bode was entitled to, and demanded, a hearing to rebut the charges. As part of that June 2003 demand, Bode told L.A. Metro that she had no further interest in practicing there, effectively withdrawing her application. The hospital refused to provide a hearing and Bode filed a mandate petition (Code Civ. Proc., § 1085) to compel L.A. Metro to provide the hearing. (*Bode v. Pacific Health Corp.* (Super. Ct. L.A. County, 2005, No. BS085342) (*Bode I*).) That petition was granted and the hospital scheduled a hearing on its decision to suspend and not renew Bode's privileges.[1]

In connection with the hearing, L.A. Metro sent Bode a letter in July 2004 stating that its decision to suspend and not renew her privileges was based on issues that were "raised regarding the return of controlled substances from January 2, 2003 through March 21, 2003." In August 2004, the hospital sent Bode a notice of charges stating that its decision was based on the six January 2003 drug documentation incidents and the missing Demerol incident. According to the hospital's notice, "[T]he totality of these incidents, occurring in such a short period of time, raised questions about your professional qualifications and/or your ability to exercise the temporary privileges you had been granted."

---

[1] Because the hospital had agreed to grant Bode a hearing on the nonrenewal of her privileges, the trial court in *Bode I* found that issue was moot. Its writ was therefore directed solely to a hearing on the initial decision to suspend Bode's privileges. Although Pacific Health Corporation was also named as a party to this action, it was dismissed before judgment was rendered and is not a party to this appeal.

Pursuant to the hospital's bylaws, the medical staff's case against Bode was brought by the hospital's medical executive committee. The finder of fact was a judicial review committee comprised of medical staff members, assisted by a hearing officer. Bode testified that other hospitals using the Sure-Med system had experienced problems with missing drugs. Bode was sure Vargas saw her return the Demerol and could not explain what happened to it. She did not return any fentanyl because she used all three ampules during the spinal surgery. Bode also claimed that the head of the hospital's pharmacy department asked her to change the patient's record to reflect that Demerol had been used. Bode declined to do so.[2] Vargas's statements were also in evidence, but Vargas did not testify.

In general, under state law and L.A. Metro's bylaws, the burden of proof for an initial applicant at this type of personnel hearing lay with the physician being disciplined. In all other cases, the burden of proof lay with the hospital.[3] The judicial review committee was unsure whether to place the burden of proof on Bode and, acting on the hearing officer's recommendation, decided the case in the alternative, first by placing the burden on Bode, then by evaluating the evidence as if the hospital bore the burden of proof. Regardless of who bore the burden of proof, the judicial review committee found that the six recording and documentation incidents in January 2003 were established only in part, and that, as to those, the hospital properly warned Bode that further incidents might result in discipline. However, regardless of who bore the burden of proof, the judicial review committee "is not making any finding that Dr. Bode's care was deficient or inappropriate." Also without regard to the burden of proof, the judicial review committee was unable to determine what happened to the missing Demerol ampule. This was based in part on confusion as to both what nurse Vargas saw and what she told others about the incident, combined with Vargas's failure to testify at the hearing.

Based on these findings, when the burden of proof was placed on the hospital, the judicial review committee found that the hospital's decision to suspend and not renew Bode's temporary privileges was not reasonable or warranted. When the burden of proof was placed on Bode, however, the judicial review committee came to a different conclusion. First, it noted that the hospital, acting on advice of counsel, had rescinded its decision to suspend Bode's temporary privileges. As a result, that decision was no longer

---

[2] The head pharmacist denied having said this.

[3] We discuss the applicable statutes and hospital bylaws in detail *post*, in parts 1 and 2 of our discussion.

at issue. In regard to the decision not to renew her temporary privileges, the judicial review committee found that Bode had failed to produce sufficient evidence of "her qualifications for medical staff privileges" at L.A. Metro. This evidence included a letter from Bode to the medical executive committee, four letters of reference, Bode's application for staff privileges, her completion of just three of six required proctoring reports, and the testimony of a physician about the charges against Bode. Based on this, the judicial review committee found that Bode "was involved in seven cases which raised concerns during the period of her temporary privileges . . . and did not present adequate evidence of her proficiency as an anesthesiologist."

Bode and the medical executive committee separately challenged the portions of the judicial review committee's findings that were unfavorable to them, by way of an appeal to the hospital board's appellate review committee. That group ruled as an issue of law that Bode was nothing more than an initial applicant who bore the burden of proof because her temporary privileges were issued solely in conjunction with her pending initial application for staff privileges.

Applying the substantial evidence test, the appellate review committee found that there was substantial evidence to uphold that portion of the judicial review committee's decision which found cause to suspend and not renew Bode's privilege when she bore the burden of proof. The appellate review committee adopted the judicial review committee's findings in this regard, and concluded that Bode's failure to "resolve all doubts" about what happened to the missing Demerol ampule meant she had failed to prove she was not responsible for its loss. The appellate review committee found that the six January 2003 reporting and documentation incidents were, by themselves, sufficient reason to suspend and not renew Bode's temporary privileges. The appellate review committee concluded in the alternative that even if the hospital bore the burden of proof, a decision for Bode was not supported by substantial evidence because the judicial review committee's findings showed that suspension and nonrenewal were proper based solely on the six January 2003 documentation incidents.

Bode then filed an administrative mandate petition (Code Civ. Proc., § 1094.5), contending the appellate review committee mistakenly placed the burden of proof on her and exceeded its authority by reweighing the evidence introduced before the judicial review committee. The trial court ruled that, as

a holder of temporary staff privileges, Bode was not an initial applicant and that the appellate review committee therefore erred to the extent its decision was based on Bode bearing the burden of proof. The trial court also found that the appellate review committee erred to the extent it alternatively relied on the six January 2003 documentation incidents to support the hospital's actions. This was so, the trial court found, because the only reason given to Bode at the time of her suspension and nonrenewal was an issue concerning the return of controlled substances, and none of the six documentation incidents involved the actual return of such items. In its judgment, the trial court said it had "independently examined the administrative record, and . . . exercised its independent judgment as to the weight of the evidence . . . ." The court issued a writ directing the hospital to vacate the appellate review committee's decision and conduct further proceedings as it deems necessary that are consistent with the court's decision.

L.A. Metro contends the trial court erred because (1) Bode was an initial applicant who bore the burden of proof; (2) the court was bound by the substantial evidence rule and could not exercise its independent judgment; and (3) under the substantial evidence rule, the appellate review committee ruled correctly.

## DISCUSSION

### 1. *Hospital Peer Review Legislation*

Acute care hospitals must have an organized medical staff that is responsible to the hospital's governing body for the adequacy and quality of medical care. (Cal. Code Regs., tit. 22, § 70703, subd. (b).) The medical staff must adopt written bylaws setting the procedures and criteria for evaluating applicants for staff appointments, credentials, privileges, reappointments, and other related matters. The bylaws must also contain an enforcement mechanism. (*Ibid.*) In short, the bylaws must establish a peer review process. (*Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1482 [80 Cal.Rptr.3d 745] (*Smith*).)

■ A peer review body must submit a report to the Medical Board of California or other appropriate agency when it takes any of the following actions due to a medical disciplinary cause or reason: (1) denies or rejects a medical licensee's application for staff membership; (2) terminates or revokes a licensee's membership, staff privileges, or employment; or (3) imposes restrictions (or restrictions are voluntarily accepted), on staff privileges, membership, or employment for a cumulative total of 30 days or

more for any 12-month period. (Bus. & Prof. Code, § 805, subd. (b).)[4] A medical cause or disciplinary reason "means that aspect of a licentiate's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." (*Id.*, subd. (a)(6).) " 'Staff privileges' means any arrangement under which a licentiate is allowed to practice in or provide care for patients in a health facility. Those arrangements shall include, but are not limited to, full staff privileges, active staff privileges, limited staff privileges, auxiliary staff privileges, provisional staff privileges, temporary staff privileges, courtesy staff privileges, locum tenens arrangements, and contractual arrangements to provide professional services, including, but not limited to, arrangements to provide outpatient services." (*Id.*, subd. (a)(4).)

At issue here is section 809.3, which allocates the burden of producing evidence and of proof at hearings that fall under the reporting requirements of section 805. The peer review body always has the initial duty to present evidence that supports the charge or recommended action. (§ 809.3, subd. (b)(1).) "Initial applicants" have the burden of proof "by a preponderance of the evidence of their qualifications by producing information which allows for adequate evaluation and resolution of reasonable doubts concerning their current qualifications for staff privileges, membership, or employment. Initial applicants shall not be permitted to introduce information not produced upon request of the peer review body during the application process, unless the initial applicant establishes that the information could not have been produced previously in the exercise of reasonable diligence." (*Id.*, subd. (b)(2).) In all other cases than those involving initial applicants, the peer review body has the burden of proving its action or recommendation is reasonable and warranted by a preponderance of the evidence. (*Id.*, subd. (b)(3).)

Section 809.3 was part of legislation that took effect in 1990, by which California opted out of federal peer review legislation and set its own standards for this process. (§§ 809–809.9.) These provisions "shall not affect the respective responsibilities of the organized medical staff or the governing body of an acute care hospital with respect to peer review . . . . It is the intent of the Legislature that written provisions implementing Sections 809 to 809.8, inclusive, in the acute care hospital setting shall be included in medical staff bylaws that shall be adopted by a vote of the members of the organized medical staff and shall be subject to governing body approval . . . ." (§ 809, subd. (a)(8).) Therefore, the peer review rules applicable here have two sources: sections 809 to 809.9 and L.A. Metro's bylaws. (*Smith, supra*, 164 Cal.App.4th at p. 1484.) We examine those bylaws next.

---

[4] All further undesignated section references are to the Business and Professions Code.

## 2. *L.A. Metro's Bylaws*

The hospital's bylaws list only six categories of staff members: provisional, active, associate, affiliate, courtesy, and honorary. The bylaws also identify three other categories of physicians who may practice at the hospital: those with contractual relationships, those who qualify as allied health professionals, and those granted temporary privileges. With the proper recommendation, temporary privileges may be granted in three circumstances: for the care of specific patients, for *locum tenens* arrangements,[5] and upon request of those who have applied for appointment to the medical staff. As to the latter, the bylaws provide: "After receipt of a completed application for Staff appointment, including a request for specific temporary privileges, an appropriately licensed applicant may be granted temporary privileges for an initial period up to 90 days, with subsequent renewals not to exceed the period in time until appointment to the Medical Staff. In exercising such privileges, the applicant shall act under the supervision of the Chief of the Department, or his designee, to which the applicant is assigned . . . ." Temporary privileges are granted "only when the information available reasonably supports a favorable determination regarding the requesting practitioner's qualifications, ability, judgment and current competence to exercise the privileges requested . . . ." They may be terminated "[u]pon the discovery of any information or the occurrence of any event of a nature which raises questions about the practitioner's professional qualifications or ability to exercise any or all of the temporary privileges granted . . . ." A practitioner whose temporary privileges are denied or terminated is entitled to the procedural rights set forth elsewhere in the bylaws.

Under the bylaws' hearing and appellate review procedures, the judicial review committee, comprised of three medical staff members, takes evidence and makes findings of fact concerning any charges or adverse actions against hospital practitioners. In all cases, the hospital has the burden of producing evidence to support the charges or recommendations. If these concern "the practitioner's initial application for Staff membership or privileges or initial application for an advancement in Staff membership category or for clinical privileges not previously granted to the practitioner, the practitioner ('initial applicant') shall have the burden of persuading the Judicial Review Committee by a preponderance of evidence of his or her current qualifications for the requested Staff membership or privileges by producing information which allows the Judicial Review Committee to adequately evaluate and resolve all reasonable doubts concerning such qualifications of the practitioner. Initial applicants shall not be permitted to introduce information during the hearing which such practitioner did not produce during the application process in

---

[5] *Locum tenens* means a physician who acts as a temporary substitute for another. (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 39 [100 Cal.Rptr.2d 627].)

response to a request from the Medical Staff for such information unless the initial applicant establishes to the satisfaction of the Judicial Review Committee that such information could not have been produced by the practitioner during the application process in the exercise of reasonable diligence. In all cases which do not involve an initial applicant, the Medical Staff representative or body taking or making the adverse recommendation(s) or action(s) shall bear the burden to present evidence which supports the recommendation(s) or action(s)."

A party may challenge a judicial review committee decision through an appeal to the appellate review committee, whose proceedings "shall be in the nature of an appellate review based upon the hearing record of the Judicial Review Committee, that committee's decision, and all other documentation considered by the Judicial Review Committee." "New or additional matters or evidence not raised or presented during the Judicial Review Committee hearing, and not otherwise reflected in the record of the hearing, shall be introduced at the appellate review only at the discretion of the [appellate committee] upon a showing of good cause and only following an explanation by the party requesting the consideration or introduction of such matter or evidence as to why it was not presented or raised at the hearing."

### 3. *Standard of Review*

■ A hospital's decisions resulting from peer review proceedings are subject to judicial review by administrative mandate under Code of Civil Procedure section 1094.5. (Bus. & Prof. Code, § 809.8; *Smith, supra*, 164 Cal.App.4th at p. 1499.) In examining a hospital board's decision, the trial court must determine two issues. The first is a question of law: whether the governing body (in this case the hospital's appellate review committee) applied the correct standard in conducting its review of the matter. Second, after determining that the correct standard was used, the trial court must determine whether the governing body's decision was supported by substantial evidence. (Code Civ. Proc., § 1094.5, subds. (b)–(d); *Weinberg v. Cedars-Sinai Medical Center* (2004) 119 Cal.App.4th 1098, 1106–1107 [15 Cal.Rptr.3d 6].)

Under the hospital's bylaws, the appellate review committee's proceedings were described as being "in the nature of an appellate review." This phrase has been judicially construed to mean that the appellate committee does not sit as a trier of fact, but instead determines whether the decision of the judicial review committee—which was the trier of fact—was supported by substantial evidence. (*Huang v. Board of Directors* (1990) 220 Cal.App.3d

1286, 1293 [270 Cal.Rptr. 41] (*Huang*).)[6] As a result, our review concerns whether the appellate review committee properly conducted *its* appellate review of the judicial review committee's decision. (*Smith, supra,* 164 Cal.App.4th at p. 1500.) Determining whether the appellate review committee chose the correct legal standards and properly applied them is a question of law. (*Ibid.*) In determining whether substantial evidence supports the appellate review committee's decision, we independently review the evidence before the judicial review committee to see if it constituted substantial evidence in support of that committee's findings of ultimate fact. We then compare our independent conclusion on that question of law with the conclusion reached by the appellate review committee to determine whether it correctly applied the substantial evidence rule. (*Id.* at p. 1516.)[7]

### 4. *Because Bode Was Not an Initial Applicant, the Hospital Bore the Burden of Proof*

Both parties agree that the burden of proof issue is to be resolved by an interpretation of section 809.3. Because section 809.3 is called into play only when a duty to report arises under section 805, it is also undisputed that the charges against Bode asserted a medical disciplinary cause or reason under that provision. Bode contends the hospital bore the burden of proof at the factfinding hearing because her temporary privileges were eliminated. The hospital contends she had the burden of proof because those privileges were inextricably linked to her pending application for staff membership, making her an initial applicant. We are therefore called upon to construe section 809.3.

In doing so, our primary task is to determine the Legislature's intent. Our first step is to scrutinize the words used in the statute and give them a plain and commonsense meaning. If the language is clear and unambiguous, there is no need for construction or for resort to indicia of the Legislature's

---

[6] The hospital incorrectly contends that *Huang* is not applicable because the bylaws at issue there specified that the appellate board applied the substantial evidence rule. The pertinent portion of the bylaws quoted by the *Huang* court is virtually identical to the hospital's. (*Huang, supra,* 220 Cal.App.3d at p. 1293; cf. *Weinberg v. Cedars-Sinai Medical Center, supra,* 119 Cal.App.4th at pp. 1108–1111 & fn. 2 [standard of review for hospital appellate boards is found in each hospital's bylaws; because the bylaws at issue did not contain language limiting the hospital's appellate body to the substantial evidence rule, the appellate board could exercise independent judgment when reviewing factfinding committee's decision, but still must accord those findings great weight].) In accord with its own bylaws, the decision issued by L.A. Metro's appellate review committee expressly stated it was applying the substantial evidence standard.

[7] As a result, even if the trial court here erred by independently weighing the evidence, that error is harmless as it does not directly affect our analysis. To the extent the trial court resolved legal issues, such as the interpretation of the relevant statutes or the hospital's bylaws, it properly employed independent review.

intent. However, the literal meaning of a statute must be aligned with its purpose. Therefore, the meaning of a statute may not be determined from a single word or sentence. The words must be construed in context, and provisions relating to the same subject matter or that are part of the same statutory scheme must be read together and harmonized to the extent possible. (*TrafficSchoolOnline, Inc. v. Superior Court* (2001) 89 Cal.App.4th 222, 230 [107 Cal.Rptr.2d 412].) Sections 805 and 809.3 are both included in article 11 on Professional Reporting, which is part of chapter 1, division 2 (Healing Arts) in the Business and Professions Code. Because section 809.3 specifically references, and is triggered by, section 805, we must read these statutes together and harmonize them if possible.

■ As noted earlier, section 805 imposes a duty to report as to medical licensees with three distinct statuses: (1) when an application for staff membership is denied or rejected; (2) when membership or staff privileges are terminated or revoked; and (3) when restrictions on staff privileges are imposed or accepted in the specified amount. (§ 805, subd. (b).) Section 809.3 sets forth only two statuses when allocating the burden of proof: "initial applicants" and all others. Section 809.3, subdivision (b)(2) goes on to state that initial applicants have the burden of proving their qualifications by producing information that allows for adequate evaluation of their suitability for staff privileges or membership. They may not produce new information at the discipline hearing without good cause. In the case of a first-time applicant (such as Bode), a decision to reject an application due to a medical disciplinary cause or reason obviously must rely on reports of misconduct or other negative incidents that occurred in the past at some other health facility. If a hospital is considering rejecting an applicant based on such information, the hospital cannot reasonably be expected to prove those incidents, and it therefore makes sense to place the burden on the initial applicant to produce sufficient information to disprove them. In other situations, when a licensee is working at a health facility under some arrangement, a decision to terminate that arrangement for a medical disciplinary cause or reason in all likelihood is based on recent conduct occurring while the licensee was at that hospital pursuant to that arrangement. In such cases, the hospital can bear the burden of proof because it will have control over and access to all the relevant witnesses and information.

Can the distinction we perceive under section 809.3 be squared up with section 805? We believe it can. The three statuses described in section 805 can also be grouped according to the same logical distinction. Those whose staff privileges have been cut off and those who had conditions imposed on their privileges due to a medical disciplinary cause or reason in all likelihood have been charged with some type of medical misconduct that occurred while working at the health facility that took that action. Those whose applications for staff membership are denied or rejected for a medical disciplinary cause

or reason are likely to be first time applicants who drew negative reports from their current or former employers.[8]

 Under section 805, subdivision (b)(2), actions taken against staff privileges must be reported, and staff privileges are broadly defined as *any arrangement* under which a licensee is allowed to practice at a health care facility, including but not limited to temporary staff privileges. Although Bode was an initial applicant, she was also granted temporary privileges, an arrangement that allowed her to provide patient care at L.A. Metro.[9] Therefore, despite her original status as an initial applicant, the actions taken against Bode's privileges triggered the reporting requirements of section 805, subdivision (b)(2). In short, based on the analysis set forth above, once the hospital granted her staff privileges as defined by section 805, it assumed the burden of proof at any hearing to justify taking action against those privileges for a medical disciplinary cause or reason. This would not have placed the burden of proof on the hospital if it had proceeded to consider Bode's initial application but, as we have observed, Bode on her own had withdrawn her application.

We find support for this interpretation in the hospital's own bylaws. They state that if an initial applicant for staff membership, privileges, or advancement in staff category has that application denied, the applicant bears the burden of proof at a hearing to contest the decision. In all other cases, the hospital bears the burden. Bode applied for and was granted temporary privileges and was therefore no longer an initial applicant for those privileges. Pursuant to the bylaws, L.A. Metro's medical executive committee bore the burden of proof for a suspension and nonrenewal of those privileges at the factfinding hearing before the judicial review committee.

The appellate review committee therefore committed legal error when it upheld the adverse actions against Bode's privileges by placing the burden of proof on her. Accordingly, we affirm the trial court's judgment to the extent it was based on the burden of proof issue.

---

[8] We recognize that a medical licensee who enjoys one type of staff privilege may apply for another type of privilege at the same health facility. Arguably, that person is an initial applicant for the new privilege or category of staff membership. In fact, as discussed below, the hospital's own bylaws provide for this scenario, placing the burden of proof on an initial applicant for a new category of privilege or staff membership. However, if that application is denied for a medical disciplinary cause or reason for purposes of section 805, the health care facility would likely be taking action against the licensee's existing privileges as well, thus shifting the burden of proof to the facility. We need not reach that issue here, however, and confine our analysis to licensees such as Bode who are applying from the outside for the first time.

[9] According to the bylaws, its grant of these privileges meant L.A. Metro had determined it was reasonably likely Bode was qualified and competent to exercise those privileges.

### 5. *Substantial Evidence Supported the Judicial Review Committee Rulings Based on a Proper Allocation of the Burden of Proof*

As noted in part 3 of our discussion, *ante*, we review the judicial review committee's decision to determine whether it was supported by substantial evidence, then compare our conclusions with those reached by the appellate review committee. Because of our holding on the burden of proof issue, the only matter left for determination is the judicial review committee's alternative finding that the actions taken against Bode's privileges were not warranted if the hospital bore the burden of proof.

The hospital does not address this scenario, confining its argument to the notion that the appellate review committee could reweigh the evidence, and that we must review that body's decision for substantial evidence. We therefore deem the issue waived. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 [46 Cal.Rptr.2d 119].) We alternatively conclude that substantial evidence supports the judicial review committee's decision under the correct burden of proof.

The judicial review committee found that of the six January 2003 documentation and reporting incidents, one was completely unfounded and the other five were founded only in part. The committee found that the letter warning Bode that further discipline, including suspension of her privileges, could result if such incidents reoccurred, was warranted. As to each incident, however, the judicial review committee expressly declined to find that Bode's care was deficient or inappropriate. The record showed that Bode received training to prevent recurrences of such incidents, and that the training had been "very successful." No other problems were reported until the March 18 incident that led to the suspension and nonrenewal of Bode's privileges. The judicial review committee was unable to determine what happened to the missing ampule of Demerol. Given nurse Vargas's initial act of signing off for its return to the Sure-Med system, followed by her conflicting versions after the Demerol went missing, the judicial review committee was justified in concluding that there was no way to apportion blame for the disappearance, and that the medical executive committee therefore failed to prove that Bode had been responsible. Because Bode appeared to have corrected the behavior that led to the January warnings, and because the medical executive committee failed to prove Bode was responsible for the missing Demerol, there was substantial evidence to support the judicial review committee's decision that, when the burden of proof was placed on the hospital, there was no good cause for the actions taken against Bode's privileges. As a result, the appellate review committee erred by concluding otherwise.

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondent shall recover her appellate costs.

Bigelow, J., and Bauer, J.,[*] concurred.

A petition for a rehearing was denied July 6, 2009, and appellant's petition for review by the Supreme Court was denied September 9, 2009, S174802.

---

[*]Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.